IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:09CV464-RJC-DSC

| | |
|---|---|
| ACS PARTNERS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **MEMORANDUM AND RECOMMENDATION** |
| AMERICON GROUP, INC., and | ) |
| MICHAEL CAPUTO, | ) |
| | ) |
| Defendants. | ) |

**THIS MATTER** is before the Court on Defendant Michael Caputo's "Partial Motion to Dismiss" and "Memorandum in Support of Defendant Michael Caputo's Partial Motion to Dismiss" (documents#14,14-1) both filed on December 3, 2009; and "Plaintiff's Memorandum in Opposition to Defendant Michael Caputo's Partial Motion to Dismiss" (document#19) filed December 21, 2009. "Defendant Michael Caputo's Partial Motion to Dismiss Plaintiff's Amended Complaint" and "Memorandum in Support of Defendant Michael Caputo's Partial Motion to Dismiss Plaintiff's Amended Complaint" (documents#20, 20-1) were both filed on December 31, 2009. Plaintiff filed "Memorandum in Opposition to Defendant Michael Caputo's Partial Motion to Dismiss Plaintiff's Amended Complaint" (document#22) on January 19, 2010.

The instant motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and is now ripe for disposition.

Having fully considered the parties' arguments, the record, and the applicable authority, the

1

undersigned respectfully recommends that Defendant's Partial Motion to Dismiss be <u>denied as MOOT</u> and Defendant's Partial Motion to Dismiss Plaintiff's Amended Complaint be <u>granted in part</u> and <u>denied in part</u>, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In this breach of contract case, employer ACS Partners, LLC ("ACS") sued its former employee Michael Caputo ("Caputo") and Caputo's current employer "Americon Group, Inc." ("Americon"). Plaintiff's suit alleges an action for breach of the parties' Non-Compete and Confidential Disclosure Agreements against Defendant Caputo. Plaintiff also alleges claims for numerous business torts, violation of the North Carolina Unfair and Deceptive Trade Practices Act, and misappropriation of trade secrets against both Defendants.

Plaintiff ACS is in the construction and renovation business in numerous states throughout the country, including North Carolina. ACS is a Georgia limited liability company with its principal place of business in Roswell, Georgia. As part of its marketing and customer development plan, ACS maintains a database of its customers and has established measures to ensure its customer database remains confidential. In addition to those measures, ACS has devoted substantial resources to developing and maintaining customer good will.

Defendant Caputo began working for ACS as the Regional Sales Manager for North and South Carolina on December 17, 2007. Caputo is a resident of Mecklenburg County, North Carolina, having relocated from Georgia. Caputo was responsible for selling ACS' services to existing and prospective customers primarily in North and South Carolina. He would travel to other states on ACS' behalf to analyze prospective projects or to entertain ACS' customers. Caputo was also responsible for taking all required steps to ensure ACS' customers were satisfied with ACS'

2

services and for establishing good will on behalf of ACS with those customers.

When he began working for ACS, Caputo signed a Non-Compete Agreement (document#1-1) and Confidential Disclosure Agreement (document#1-2). The Non-Compete Agreement specifically precluded Caputo, for two years following the termination of his employment, from attempting to "solicit, divert or take away any clients, customers or accounts, or prospective clients, customers or accounts, of [ACS]...." (document#1-1). The Confidential Disclosure Agreement prohibited Caputo from using or disclosing, except for the purpose of his employment, "certain ideas and information relating to construction and the construction industry that is [sic] confidential and proprietary to [ACS]." (document#1-2).

While Caputo was working for ACS, James E. Tatterson ("Tatterson"), a former ACS Project Manager in Florida, formed Americon Group Inc. ("Americon"), a company that directly competes with ACS. Americon was incorporated on April 10, 2009, fourteen days before Tatterson resigned from his position at ACS. On or about September 21, 2009, another former ACS employee, Donald J. Stratton ("Stratton") resigned from ACS and immediately began working for Americon. According to Plaintiff, both Tatterson and Stratton used confidential and proprietary information in performing services for Americon.

Plaintiff alleges that Caputo, while still working for ACS, solicited ACS customers to cease doing business with ACS and begin doing business with Americon. Plaintiff avers that through his management position, Caputo was privy to confidential information, including but not limited to ACS' pricing methodology. Plaintiff contends that while still working for ACS, Caputo bid on a project located in Granite Falls, North Carolina on behalf of Americon and used the pricing he established while employed by ACS to determine a lower price on behalf of Americon. Caputo and

Americon were able to underbid ACS and be awarded the project. Plaintiff alleges that but for Caputo's actions, ACS would have been awarded the project.

Plaintiff alleges that Caputo accessed ACS computers and obtained confidential and proprietary information, including but not limited to ACS' pricing methodology, and used that information to compete with ACS. In addition, Caputo purchased groceries, family dinners and a vacation for himself and his spouse to San Francisco, California and charged them as business expenses, which ACS paid. ACS asserts that Caputo was not authorized to submit personal expenses for reimbursement.

Tatterson and Stratton approached Caputo and solicited him to leave employment with ACS and accept a position with Americon. On October 5, 2009, Caputo resigned from ACS and went to work for Americon.

Plaintiff filed this action on December 29, 2009 against Defendants Americon and Caputo alleging (1) violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030, *et seq*., against both Defendants; (2) breach of the Non-Compete and Confidential Disclosure Agreements against Caputo; (3 & 4) tortious interference with contract and prospective advantage against both Defendants; (5) breach of fiduciary duty against Caputo; (6) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*., by both Defendants; and (7) misappropriation of trade secrets, N.C. Gen. Stat. § 66-152, *et seq*., against both Defendants; (8) unjust enrichment against both Defendants; (9) civil conspiracy against both Defendants; and (10) punitive damages pursuant to N.C. Gen. Stat. § 1D-15.[1] (document#1). Plaintiff seeks temporary

---

[1] ACS filed a similar lawsuit in the United States District Court for the Middle District of Florida. See ACS Partners, LLC v. Americon Group, Inc., Donald J. Stratton and James E. Tatterson, Case No. 6:09-cv-01846.

and/or permanent injunctive relief, together with monetary damages, as well as punitive damages against both Defendants.

Subsequently, Defendant Caputo filed a Rule 12(b)(6) Partial Motion to Dismiss Plaintiff's Complaint (document#14). On December 31, 2009, Plaintiff amended its Complaint, adding factual allegations and alleging a claim for conversion. (document#18). Defendant Caputo then filed a Motion to Partially Dismiss the Amended Complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. Pro. 12(b)(6). (document#20). Defendant Caputo moved to dismiss Plaintiff's claims for breach of the Non-Compete and Confidential Disclosure Agreements, tortious interference with contract, tortious interference with prospective advantage, violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*., misappropriation of trade secrets, N.C. Gen. Stat. § 66-152, *et seq*., and conversion.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1960 (2009), quoting Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the

5

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. 129 S. Ct. at 1951. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1951 (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true), citing Twombly, 550 U.S. at 554-55. Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950.

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 1951. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id., quoting Fed. R. Civ. P. 8(a)(2). In other words, if after taking the complaint's well-pleaded factual allegations as true, a lawful alternative explanation appears a "more likely" cause of the complained of behavior, the claim for relief is not plausible. Id. at 1951-52.

6

**B. Choice of Law**

As to the state law claims asserted by Plaintiff, the Court applies North Carolina's substantive law, including its choice of law rules. Colgan Air, Inc. V. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). The parties' Non-Compete Agreement (document#1-1) and Confidential Disclosure Agreement (document#1-2) (collectively "the agreements") are silent as to choice of law.

North Carolina law controls Plaintiff's claim for breach of contract because the contract was to be performed primarily in North Carolina. Cocke v. Duke University, 260 N.C. 1, 8, 131 S.E.2d 909, 913 (1963) (quoting Elk Rivier Coal & Lumber Co. v. Funk, 222 Iowa 1222, 271 N.W. 204 (1937)) ("Where a contract is to be performed wholly outside the state in which the contract was made, the parties are presumed to adopt the law of the place of performance as the law of the contract."). Even though the agreements were signed in Georgia, ACS executed the agreements with the expectation Caputo would relocate to North Carolina and perform his job duties outside the state of Georgia, primarily in North and South Carolina. Caputo later moved to North Carolina after the execution of the agreements. (document#18, 38).

The parties do not dispute that North Carolina law governs Plaintiff's claims for tortious interference with contract, violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*., misappropriation of trade secrets in violation of N.C. Gen. Stat. § 66-152, *et seq*., and conversion.

**C. Breach of Non-Compete and Confidential Disclosure Agreements**[2]

---

[2]Caputo seeks a dismissal of the claims for breach of the Non-Compete and Confidential Disclosure Agreements, but he does not address the merits of the breach of the Confidential Disclosure Agreement portion of the claim. Therefore, the Court will only address the validity of the Non-Compete Agreement.

7

ACS' Non-Compete Agreement is not per se unreasonable at the motion to dismiss stage. The reasonableness of a non-competition covenant is a matter of law for the court to decide. Shute v. Heath, 131 N.C. 281, 282, 42 S.E. 2d 704, 704 (1902). Under North Carolina law, a covenant not to compete is valid and enforceable if it is (1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) designed to protect a legitimate business interest of the employer. A.E.P. Indus. Inc., v. McClure, 308 N.C. 393, 402-3, 302 S.E.2d 754, 760 (1983).

In North Carolina, the protection of customer relationships and good will against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer. United Labs., Inc., v. Kuykendall, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (1988). A covenant is reasonably necessary for the protection of a legitimate business interest if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers. Id at 650.

Time and geographic limitations of a covenant not to compete must be considered in tandem, such that a longer period of time is acceptable where the geographic restriction is relatively small, and vice versa. Jewel Box Stores Corp. v. Morrow, 272 N.C. 659, 665, 158 S.E.2d 840, 844 (1968). The scope of the geographic restriction must not be any wider than necessary to protect the employer's reasonable business interests. Triangle Leasing Co. v. McMahon, 327 N.C. 224, 229, 393 S.E.2d 854, 857 (1990). The North Carolina Supreme Court has recognized the validity of geographic restrictions that are limited not by area, but by a client-based restriction. Kuykendall, 322 N.C. at 660, 370 S.E.2d at 386 (1988).

8

In this case, the non-solicitation portion of the Non-Compete Agreement contains a client-based, rather than a geographic restriction. It specifically precludes Caputo, for two years[3] following the termination of his employment, from attempting to "solicit, divert or take away any clients, customers or accounts, or prospective clients, customers or accounts, of [ACS]...." (document#1-1).

Caputo contends that the Non-Compete Agreement is facially overbroad and unenforceable because it is not limited to protecting ACS' interests, but instead, prohibits Caputo from soliciting any "prospective clients, customers or accounts" anywhere in the United States. Caputo argues that the Non-Compete Agreement would prevent him from engaging in the building renovation business anywhere in the United States, because everyone is a prospective customer.

Generally, North Carolina courts uphold national territory restrictions in covenants not to compete when the plaintiff company does business nationally. Harwell Enter., Inc. v. Heim, 276 N.C. 475, 173 S.E.2d 316, 320 (1970) (North Carolina Supreme Court found that to a company engaged in nationwide activities, nationwide protection would appear to be reasonable and proper); Triangle Leasing Co., Inc. v. McMahon, 327 N.C. 224, 393 S.E.2d 854 (1990) (finding the territorial restriction in the non-competition clause of the parties' contract was reasonable and enforceable because defendant's access to customer lists, price sheets, and policies affecting company business outside of the Wilmington area would warrant a contractual prohibition against solicitation of plaintiff's customers regardless of their location). These cases are factually distinguishable because the Harwell provisions at issue were not client based restrictions on solicitation, and the Triangle

---

[3]Caputo does not argue that the time limit of two years is excessive, and two year time restrictions have been upheld. Triangle Leasing Co., Inc., 327 N.C. 224, 393 S.E.2d 854 (1990); Harwell Enter., Inc. v. Heim, 276 N.C. 475, 481, 173 S.E.2d 316, 320 (1970) (upholding a two-year restriction).

9

Leasing provision only restricted solicitation of known customers in areas where the company operated.

While it is true that the lack of a territory restriction does not automatically invalidate a non-solicitation provision, (See Market Am. Inc. v. Christman-Orth, 135 N.C. App. 143,153, 520 S.E.2d 570, 578 (1999)), a provision that does not adequately define the scope of the restriction is overly broad. Hartman v. W.H. Odell & Assoc., Inc., 117 N.C. App. 307, 450 S.E.2d 912 (1994) (Former employer failed to justify broad geographic scope of world-wide covenant not to compete, where covenant defined "clients" as including persons with which former employer was engaged in discussions when former employee left, but who might never have become clients).

Caputo's argument has merit because the Non-Compete Agreement does not define "prospective clients, customers or accounts." When a term is not defined in a contract, the presumption is that the term be given its ordinary meaning and significance. E.L. Scott Roofing Co. v. State, 82 N.C. App. 216, 223, 346 S.E.2d 515, 520 (1986). Plaintiff contends that in the business context, the word "prospect" means "a likely or prospective customer...." and "prospective" means "expected; likely; future." Webster's New Word Dictionary, 2nd College Ed. According to Plaintiff, the word "prospect" is intended to mean those potential customers whom ACS (and Caputo) believed were in the buying process and likely or expected to become actual customers. If Plaintiff intended to adopt the above definition of "prospect", then the agreement should have defined "prospect" accordingly. A more reasonable definition of "prospective clients" would be those clients with whom Caputo actually interacted during the six months preceding his resignation. See Wade S. Dunbar Ins. Agency, Inc. v. Barber, 147 N.C.App. 463, 469, 556 S.E.2d 331, 336 (N.C. App. 2001) (upholding as valid a non-compete covenant that restricted defendant, for two years, from

10

soliciting any customers having an active account with plaintiff at the time of his termination or *prospective customer* whom defendant himself had solicited within the six months immediately preceding his termination) (Emphasis added).

However, where the language of a restrictive covenant is overly broad, North Carolina law severely limits the Court's options to "blue pencil" offending terms. North Carolina's "blue pencil" rule is a narrow exception, and its use by the courts is discretionary. Hartman v. W.H. Odell & Assoc., Inc., 117 N.C. App. 307, 450 S.E.2d 912 (1994). Unless the overly broad portion is a "distinctly separable part of a covenant" North Carolina courts cannot rewrite the contract and will simply not enforce it. Id. at 920. Here, the offending provision does not appear to be severable. Therefore, the Court declines to "blue pencil" the non-solicitation provision of the Non-Compete Agreement.

If the Court defines "prospective" as "expected, likely or future," then it is possible that the non-solicitation provision could be overly broad as applied to Caputo. But, the non-solicitation provision is not so unreasonable as to be declared unenforceable as a matter of law on a FRCP 12(b)(6) Motion to Dismiss.

The Court is unable to conclude that a covenant restricting solicitation of ACS' clients and prospective clients for two years is overly broad and unenforceable as a matter of law. Here, the enforceability of the Non-Compete Agreement must rest on factual questions such as (1) the area, or scope of the restriction, (2) the area assigned to Caputo, (3) the area in which Caputo actually worked, (4) the area in which Caputo operated, (5) the nature of the business involved, and (6) the nature of Caputo's duty and his knowledge of ACS' business operation. Okuma Am. Corp. v. Bowers, 181 N.C. App. 85, 89, 638 S.E.2d 617, 620 (N.C. App. 2007) citing Hartman v. W.H. Odell

11

& Assoc., Inc., 117 N.C. App. 307, 312, 450 S.E.2d 912, 917(1994) (reversing the trial court's 12(b)(6) dismissal of a claim for breach of a non-compete covenant when dismissal was based on the unenforceability of the covenant not to compete as a matter of law).

When taken as true, ACS' Amended Complaint states a claim for which relief might be granted as to the breach of the Non-Compete Agreement. The Court will therefore recommend that Defendant Caputo's Motion to Dismiss as to the breach of the Non-Compete and Confidential Disclosure Agreements be denied.

**D. Tortious Interference with Contract and Prospective Advantage**

The economic loss rule bars Plaintiff's tort claims. Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor under the economic loss doctrine. North Carolina Ports Authority v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81 (1978)(rev'd on other grounds). In North Carolina, tort claims which arise out of breach of contract claims are allowed only in "carefully circumscribed" circumstances. Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998).

Tortious conduct must be "identifiable" and "distinct from the primary breach of contract claim," and must be accompanied by sufficient aggravating circumstances. Broussard, 155 F.3d at 347; See PCS Phosphate Co. v. Norfolk S. Corp., 559 F.3d 212, 224 (4th Cir. 2009); See also Strum v. Exxon Co., U.S.A., 15 F.3d 327, 330-1 (4th Cir. 1994). The alleged conduct must have an element of malice, recklessness or some similarly culpable state of mind in order to justify an award of punitive damages. Strum, 15 F.3d at 330-1. The policy behind the "independent tort" exception is to keep open-ended tort damages from distorting contractual relations in light of the fundamental difference between tort and contract claims. Broussard, 155 F.3d at 346.

In Broussard, Meineke franchisees sued Meineke under a breach of contract theory. Meineke also brought claims based upon tort and North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). The Fourth Circuit found that the district court erred by allowing the plaintiffs to advance tort and UDTPA claims paralleling their breach of contract action. Id. The Fourth Circuit held that Plaintiffs claims for negligence in Broussard arose out of performance of the contract "not out of the type of distinct circumstances necessary to allege an independent tort." Id.

When faced with a Broussard problem, courts ask whether the claims at issue could really be decided under contract theory. Courts only allow tort causes of action if contract theory is insufficient to cover the facts. Capital Factors, Inc. v. The Fryday Club, Inc., 209 F. Supp.2d 583, 585 (W.D.N.C. 2002) (denying a motion to dismiss counterclaims for fraud, negligent representation and unfair trade practices where the facts alleged by the defendant gave rise to separate, distinct, and therefore identifiable tort claims). For example, in Capital Factors, Judge Mullen found evidence that plaintiff willfully, with intent to deceive, transferred debts attributable to a third party to defendant's account, withdrew funds from defendant's account, failed to credit defendant's account for payments made by defendant or its customers, and failed to provide defendant with account statements. Id.

Like Broussard, the parties' dispute in this case is contractually based. Plaintiff fails to allege an independent reason for a tort-based claim. Plaintiff argues that Caputo solicited its customers and prospects and made a bid to an ACS prospect on behalf of Americon, while still employed by ACS. At most, Plaintiff may be able to prove that Caputo did not carry out his contractual obligations. The mere failure to carry out an obligation in contract, however, does not support an action for tortious

13

interference with contract and prospective advantage.[4]

Plaintiff's claim for tortious interference with contract is neither "identifiable" nor "distinct from" the breach of contract. Plaintiff fails to allege the existence of a valid contract between ACS and a third person, or that Caputo intentionally induced a third person not to perform the contract. Plaintiff's claim for tortious interference with prospective advantage may be "identifiable," but it is not "distinct from" the primary breach of contract. The purpose of the Non-Compete Agreement was to ensure that Caputo would not compete with ACS or solicit its customers. Broussard does not allow Plaintiff a double recovery for the same conduct alleged in the breach of contract claim.

Plaintiff's tort claims arise out of the performance of the Non-Compete and Confidential Disclosure Agreements and the alleged breach of those agreements. They are not independent torts as required by North Carolina law. See HPS Technologies, Inc. v. E.I. Dupont De Nemours and Co., 2009 WL 3434280 (M.D.N.C. October 20, 2009)(recommending dismissal of plaintiff's tort claims because they are barred by North Carolina's economic loss doctrine as tort claims that are not "distinct from" the primary breach of contract action).

---

[4]The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induced the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff. United Labs., Inc. v. Kuykendall, 322 N.C. 643, 370 S.E.2d 375 (1988) citing Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176 (1954).

To establish a claim for interference with prospective advantage, Plaintiff must prove that: (1) a specific potential contract between the Plaintiff and a third party exists; (2) the Defendant intentionally induced the third party not to enter into the contract; (3) the Defendant acted without justification; (4) but for the Defendant's action the Plaintiff and the third party would have entered into the contract; and (5) the Defendant's action caused actual damage to the Plaintiff. Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001).

The Court recommends that Defendant Caputo's Motion to Dismiss Plaintiff's claims for tortious interference with contract and prospective advantage be granted.

### E. Violation of Unfair and Deceptive Trade Practices Act ("UDTPA")

Defendant Caputo's conduct is not actionable as an unfair or deceptive trade practice. According to Broussard, a UDTPA claim cannot "piggyback" on a breach of contract action, even where the breach of contract was clearly intentional. Broussard, 155 F.3d at 347. North Carolina law does not permit a party to transmute a breach of contract claim into a tort or UDTPA claim for extraordinary damages because awarding punitive or treble damages would destroy the parties' bargain and force the defendant to bear a risk it never took on. Id. at 346 citing Strum v. Exxon Co., 15 F.3d 327, 330 (4th Cir.1994); See also PCS Phosphate Co., Inc. v. Norfolk Southern Corp., 559 F.3d 212 (4th Cir. 2009) (refusing to awarding treble damages pursuant to North Carolina's UDTPA for claims that were essentially contractual in nature because it would be tantamount to re-writing the parties' contract).

Plaintiff alleges that Caputo committed an unfair and deceptive trade practice when he solicited ACS' current and prospective clients and used ACS' pricing scheme to obtain the Granite Falls Project for Americon. These factual allegations do not point to the sort of "substantial aggravating circumstances" that are necessary to support a claim under the UDTPA. Broussard, 155 F.3d at 347 citing Branch Banking & Trust Co. v. Thompson, 107 N.C.App. 53, 418 S.E.2d 694, 700 (1992).

As in Broussard, Plaintiff's allegations under the UDTPA are not "distinct from" the primary breach of contract action. Rather, the claims are based on the "existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement." Broussard 155 F.3d at 347.

15

Case 3:09-cv-00464-RJC-DSC   Document 23   Filed 02/12/10   Page 15 of 20

Caputo's alleged misuse of ACS' pricing scheme and solicitation of ACS' clients directly relate to the breach of the Non-Compete and Confidential Disclosure Agreements. ACS drafted the Agreements with provisions specifically addressing the alleged misuse of ACS' pricing scheme and solicitation of ACS' clients. Therefore, the agreements should govern these aspects of the parties' relationship.

Plaintiff can best address its complaints by pursuing its claim for breach of contract. Mecklenburg County v. Nortel Gov't Solutions, Inc., 2008 WL 906319 at *5 (W.D.N.C. April 1, 2008)(dismissing plaintiff's UDTPA claims for failure to allege distinct and identifiable facts outside of contract performance). Moreover, Caputo's misconduct came *after* the execution of the Non-Compete and Confidential Disclosure Agreements. Thus, the timing of Caputo's alleged misconduct suggests that it falls within the parameters of the parties' contract.

Additionally, Plaintiff's claims are "far from the reach of the UDTPA because they are wholly divorced from the context of consumer transactions." PCS Phosphate Co., 559 F.3d at 225 (4th Cir. 2009). In PCS Phosphate, the Fourth Circuit noted that the UDTPA was intended to benefit consumers. Id. citing Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 710 (2001). This dispute falls outside of the consumer transaction context because it is between an employer and an employee.

Therefore, the Court recommends that Defendant Caputo's Motion to Dismiss the North Carolina Unfair and Deceptive Trade Practices Act claim be granted.

    **F. <u>Misappropriation of Trade Secrets</u>**

Plaintiff's claim under the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. § 66-152, *et seq.*, contains sufficient facts to state a plausible claim for relief. The TSPA establishes a private right of action on the part of an owner of a trade secret against a party alleged

16

to have misappropriated trade secrets. N.C. Gen. Stat. § 66-153.[5] To plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to provide notice to a defendant of what he is accused of misappropriating and for a court to determine whether misappropriation has or is threatened to occur. See Visionair v. James, 167 N.C. App. 504, 510-11, 606 S.E.2d 359, 364 (N.C.App. 2004) (injunction properly denied where trade secret described only in broad product and technology categories); See also FMC Corp. V. Cyprus Foote Mineral Co., 899 F.Supp. 1477, 1484 (W.D.N.C. 1995) (preliminary injunction inappropriate where trade secret described only in general terms and where evidence of blatant misappropriation not shown).

Plaintiff alleges that Caputo obtained access to its trade secrets, including its pricing methodology. Plaintiff further alleges that Caputo used ACS' pricing methodology to underbid ACS and obtain the Granite Falls project for Americon, a competitor of ACS. Defendant Caputo counters that Plaintiff's identification of its trade secrets is vague, conclusory and overbroad, like the description in Washburn v. Yadkin Valley Bank and Trust Co., 190 N.C.App. 315, 327, 660 S.E.2d 577, 586 (N.C. Ct. App. 2008) (finding that employer's allegations were insufficient to state a claim for misappropriation of trade secrets).

Washburn is distinguishable on its facts. In Washburn, the employer identified the trade secrets as "employer's business methods, clients, and other confidential information pertaining to employer's business." Washburn, 190 N.C.App. at 327, 660 S.E.2d at 586. Unlike ACS, the Washburn plaintiff did not refer to a pricing methodology in its description of the alleged

---

[5]Misappropriation of a trade secret is prima face established by the introduction of substantial evidence that the person against whom relief is sought both: (1) knows or should have known of the trade secret; and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner. N.C. Gen. Stat. § 66-155.

17

misappropriated trade secrets. In North Carolina, price lists may constitute trade secrets. N.C. Elec. Membership Corp. v. N.C. Dept. of Economic and Community Dev.,108 N.C.App. 711, 718, 425 S.E.2d 440, 444 (N.C.App. 1993) (holding that documents containing pricing information, market forecasts, and feasibility studies that were developed unilaterally by the party seeking to enjoin disclosure, were trade secrets). Here, ACS adequately identifies its trade secret as its pricing methodology.

The Court recommends that Defendant Caputo's Motion to Dismiss the misappropriation of trade secrets claim be denied.

### G. Conversion

ACS has not sufficiently pled facts to establish a claim for conversion. Plaintiff contends that Caputo was reimbursed for personal expenses that he characterized as business expenses. Plaintiff further contends that it paid those expenses with its funds and now has been deprived of the use of those funds paid to Caputo.

In North Carolina, conversion is generally defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Peed v. Burleson's, Inc., 244 N.C. 437, 94 S.E.2d 351, 353 (1956). When the cause of action is for the conversion of money, that money must be identifiable and described as a specific chattel. Alderman v. Inmar Enter., Inc., 201 F.Supp.2d 532, 548 (M.D.N.C. 2002). Money must be segregated from other funds or kept in a separate bank account and not commingled with the alleged converter's other funds. Id.

Plaintiff identifies the money only as "funds," which is not something that can exist as a specific chattel. Id. Plaintiff does not allege that the converted funds were kept separate from

Caputo's other funds. Plaintiff does not specify the amount of money allegedly converted by Caputo. Furthermore, the documents and information necessary to learn of the amount of "funds" owed is in Plaintiff's possession.

The claim is also deficient for an additional reason. Plaintiff's amended complaint contains no allegations that Plaintiff demanded the return of the money or that Caputo refused such a demand. <u>TSC Research, LLC v. Bayer Chemicals Corp.</u>, 552 F.Supp.2d 534, 542 (M.D.N.C. 2008) <u>citing</u> <u>Hoch v. Young</u>, 63 N.C.App. 480, 483, 305 S.E.2d 201, 203 (1983) (granting a motion to dismiss for failure to state a claim for conversion). In <u>TSC Research</u>, the Court held that where a defendant receives the chattel pursuant to a contract, there is no conversion until the defendant gives an absolute, unqualified refusal to surrender the chattel. Here, Caputo received the money as a business expenses in the performance of his contract for employment with ACS. Thus, according to <u>TSC Research</u>, Plaintiff's failure to allege demand and refusal is fatal to its conversion claim. Plaintiff's conversion claim is insufficient on its face for failing to allege essential elements of conversion.

Accordingly, the Court recommends that Defendant Caputo's Motion to Dismiss Plaintiff's claim for conversion be <u>granted</u>.

## IV. <u>RECOMMENDATION</u>

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Defendant's Partial Motion to Dismiss (document#14) be **DENIED as MOOT** and Defendant's Partial Motion to Dismiss Plaintiff's Amended Complaint (document#20) be **GRANTED IN PART** and **DENIED IN PART**, that is, **DENIED** as to Plaintiff's claim for breach of the Non-Compete and Confidential Disclosure Agreements and misappropriation of trade secrets, and **GRANTED** as to Plaintiff's claims for conversion, tortious interference with contract and prospective advantage,

and violation of North Carolina's Unfair and Deceptive Trade Practices Act.

## V. <u>NOTICE OF APPEAL RIGHTS</u>

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>United States v. Rice</u>, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to <u>de novo</u> review by the district court. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder</u>, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Diamond</u>, 416 F.3d at 316; <u>Wells</u>, 109 F.3d at 201; <u>Page</u>, 337 F.3d at 416 n.3; <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; <u>and to the Honorable Robert J. Conrad, Jr.</u>

**SO RECOMMENDED.**

Signed: February 12, 2010

_____
David S. Cayer
United States Magistrate Judge